AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |  Case No. 20-sw-81
| four digital devices, currently located at MPD's Evidence | ) |
| Control Branch located at 17 DC Village Lane SW, | ) |
| Washington, DC under Rule 41 | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U S C 2, 111(a)(1) and (b) | Assault on federal employee, aiding and abetting |
| 18 U S C 2 and 641 | Theft of government property, aiding and abetting |
| 22 D C Code 2801 and 4502 | Armed robbery |
| 22 D C Code 403, 2801, and 4502 | Assault with intent to commit robbery |
| 22 D C Code 404(a)(2) | Assault with significant bodily injury |
| 22 D C Code 2801 | Robbery |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Andr MCCa*

*Applicant's signature*

Detective Andrew McCallum

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means).*

Date:  ___03/16/2020___

City and state:  Washington, D.C.

*Judge's signature*

Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>four digital devices, currently located at MPD's Evidence Control )<br>Branch located at 17 DC Village Lane SW, Washington, DC )<br>under Rule 41 ) | Case No.  20-sw-81 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____ March 30, 2020 _____ *(not to exceed 14 days)*
   ☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Robin M. Meriweather _____ .
*(United States Magistrate Judge)*

   ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   3/16/2020 _____          _____
                                                            *Judge's signature*

City and state:   Washington, D.C. _____          Robin M. Meriweather, U.S. Magistrate Judge
                                                            *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  20-sw-81 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched, hereinafter "the Devices," are:

> Device 1: a silver iPhone bearing FCC ID:BCG-E2946A IC: 579C-E2946A seized from Christian Lopez-Lucca incident to his arrest;

> Device 2: a black phone marked "cricket LG" seized from Christian Lopez-Lucca incident to his arrest;

> Device 3: an silver iPhone bearing FCC ID: BCG-E2946A IC: 579C-E2946A seized from Olivia Dansby incident to her arrest;

> Device 4: a pink iPhone bearing FCC ID: BCG-E308A IC: 579C-E3085A seized from Olivia Dansby incident to her arrest;

The Devices are currently located in MPD custody at 17 DC Village Lane SW Washington, D.C. (MPD's Evidence Control Branch).

## ATTACHMENT B

*Property to be seized*

The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 2 and 111(a)(1) and (b) (assault on a federal employee and aiding and abetting); 18 U.S.C. §§ 2 and 641 (theft of government property and aiding and abetting); 22 D.C. Code §§ 2801 and 4502 (armed robbery, two counts); 22 D.C. Code §§ 403, 2801, and 4502 (assault with intent to commit robbery while armed); 22 D.C. Code § 404(a)(2) (assault with significant bodily injury); and 22 D.C. Code § 2801 (robbery) (collectively the "target offenses") as described in the search warrant affidavit, including, but not limited to records and information:

(a) establishing or documenting the commission of the target offenses;

(b) containing photographs or video that would constitute evidence of the target offenses;

(c) documenting the relationship of Christian Lopez-Lucca and Olivia Dansby to each other, to the victims of the target offenses, to the locations of the target offenses, and to the businesses where credit or debit cards stolen from the complainants were used;

(d) connecting Christian Lopez-Lucca and Olivia Dansby to the actual or attempted fraudulent use of credit or debit cards stolen from the complainants;

(e) evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

(f) evidence of software, or the lack thereof, that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

(g) evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

(h) evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

(i) evidence of the times the Devices were used;

(j) passwords, encryption keys, and other access devices that may be necessary to access the Devices;

(k) documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

(l) records of or information about Internet Protocol addresses used by the Devices; and

(m) records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR DIGITAL DEVICES, CURRENTLY LOCATED AT MPD'S EVIDENCE CONTROL BRANCH LOCATED AT 17 DC VILLAGE LANE SW, WASHINGTON, D.C. UNDER RULE 41 | SW No. 20-81 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Andrew McCallum, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four digital devices—which are currently in law enforcement possession (the "Devices"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2.      I am a Detective with the Metropolitan Police Department (MPD) and have been an employee of MPD since 2009. I have participated in hundreds of arrests, and as a Detective, I have personally led hundreds of criminal investigations. I have been the affiant on numerous arrest and search warrants and participated in investigations that have led to prosecutions in Superior Court and federal court. In addition to my Police Academy training, I have also participated in advanced training as a criminal investigator. Through ongoing training and daily interactions and participation in investigations with more senior detectives, I continue to develop professionally.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      On February 25, 2020, the grand jury returned an indictment charging the Christian Lopez-Lucca and Olivia Dansby with (1) assault on a federal employee and aiding and abetting in violation of 18 U.S.C. §§ 2 and 111(a)(1) and (b); (2) theft of government property and aiding and abetting in violation of 18 U.S.C. §§ 2 and 641; (3) armed robbery in violation of 22 D.C. Code §§ 2801 and 4502; (4) assault with intent to commit robbery while armed in violation of 22 D.C. Code §§ 403, 2801, and 4502; (5) assault with significant bodily injury in violation of 22 D.C. Code § 404(a)(2); (6) robbery in violation of 22 D.C. Code § 2801; and (7) another count of armed robbery in violation of 22 D.C. Code §§ 2801 and 4502. There is also probable cause to search the Devices, further described below and in Attachment A, for the things described in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The Devices to be searched were recovered from the defendants when they were arrested near 1800 Q Street SE in Washington, D.C., on February 21, 2020. The facts and circumstances of the seizure of the Devices is detailed further below.

6.      The Devices include:

   a.   Device 1: a silver iPhone bearing FCC ID:BCG-E2946A IC: 579C-E2946A seized from Christian Lopez-Lucca incident to his arrest;

    b. <u>Device 2</u>: a black phone marked "cricket LG" seized from Christian Lopez-Lucca incident to his arrest;

    c. <u>Device 3</u>: an silver iPhone bearing FCC ID: BCG-E2946A IC: 579C-E2946A seized from Olivia Dansby incident to her arrest;

    d. <u>Device 4</u>: a pink iPhone bearing FCC ID: BCG-E308A IC: 579C-E3085A seized from Olivia Dansby incident to her arrest;

7.     The Devices are currently located in MPD custody at 17 DC Village Lane SW Washington, D.C. (Evidence Control Branch).

<b><u>PROBABLE CAUSE</u></b>

8.     The defendants are charged with committing a host of crimes on three different dates against three different victims in a robbery spree from February 6, 2020, to February 13, 2020. The Devices were seized from them when they were finally arrested on February 21, 2020.

<b>Attack on February 6, 2020 – 400 block of F Street N.W.</b>

9.     Around 6:30 a.m. on February 6, 2020, the police responded to the 400 block of F Street N.W. for the report of an injured citizen bleeding from the head. The complainant (C-1), a security specialist at the Federal Bureau of Investigation, was taken to G.W. Hospital's emergency room. At the hospital, he told detectives that he had left his home for work around 6 a.m. that morning, taking a WMATA Metro train from College Park to Gallery Place on the Green Line. C-1 recalled getting out of the train at Gallery Place, walking up the escalators, and seeing people standing around him to assist as well as lights from an ambulance. He reported having no memory of the physical assault or robbery. C-1 was missing his wallet that contained U.S. currency ($90.00), his Metro Transit SmarTrip Card (#0167 1069 6579 6406 9126), VA Driver's license,

3

MD Driver's License, UMD Student ID, and several credit cards. He suffered visible injuries during the assault and robbery, including a large laceration to his forehead, skull fractures, and bleeding on the brain. The attending physician told detectives that C-1 would be transferred to intensive care to be prepared for surgery.

10.     Police soon determined that C-1 had a trackable SmarTrip card that was used at the Georgia Ave. Metro Station at around 8:33 a.m. An extensive review of Metro Transit Video footage revealed the following: At approximately 6 a.m. on February 6, 2020, C-1 was observed entering the College Park Metro Station. The suspects were captured going into the Columbia Heights station a few minutes later. The suspects were captured getting off of a train following directly behind C-1 at the Gallery Place Metro Station at approximately 6:20 a.m. At approximately 6:25 a.m., the suspects can be observed on an exterior camera (Transit HQ) following C-1 eastbound along the north sidewalk of the 500 Block of F Street N.W. At approximately 6:27 a.m., Defendant Lopez-Lucca was captured on an exterior camera (Transit HQ) kneeling down near a planter/barrier and appeared to be dropping something adjacent to the planter. After placing what was later found to be a bat adjacent to the planter in front of 600 5th Street N.W., Washington, D.C., Defendant Lopez-Lucca fled along with Defendant Dansby in a north-bound direction on 5th Street N.W. towards G Street N.W., Washington, D.C.

11.     Detectives separately discovered that an unknown male was captured on video kicking at a planter in front of the building where the bat was discarded. A contract security guard (W-2) working at 600 5th Street N.W. was captured retrieving what appeared to be a black bat that

4

was adjacent to the planter around 6:46 a.m. and placing it into the trunk of his vehicle. A detective followed up with W-2 and recovered the baseball bat.

12.     In summary, the actual assault and robbery upon C-1 was not captured on video footage. However, video does capture the suspects following C-1 throughout the metro system, following C-1 one minute prior to the robbery, and fleeing the scene one minute after the robbery as Defendant Lopez-Lucca appears to discard the bat. The video of this portion of the event is grainy and at a fair distance. Further investigation revealed that C-1's stolen credit cards were used throughout Washington, D.C. Detectives followed up and retrieved transaction information and footage of Defendant Dansby using the cards. Defendant Lopez-Lucca is also seen on the footage where the cards are fraudulently used accompanying Defendant Dansby. The images were used, amongst other images gathered throughout the investigation, to create BOLO (Seeking to Identify) documents that were circulated through various channels. One of the stolen credit cards that was used fraudulently was issued by the Federal Government.

**Attack on February 12, 2020 – 500 block of E Street N.W.**

13.     Around 7:30 a.m. on February 12, 2020, the police responded to a reported robbery at 5th and E Streets N.W. The complainant for this offense (C-2) reported that he had gotten out at the Archives Metro Station and began walking north on 7th Street N.W. He then walked east on the south side of E Street N.W. C-2 crossed over to the north sidewalk in the 500 block of E Street N.W. While C-2 was walking, he was wearing his headphones and his cell phone was in his left hand. On the 500 block of E Street N.W., Defendant Lopez-Lucca grabbed C-2 from behind and

walked him into a small door opening within the block. Defendant Lopez-Lucca began tussling with C-2 while stating "give me your money, give me your bag." C-2 advised that his cell phone fell from his hand during the tussle. C-2 was able to disengage from Defendant Lopez-Lucca and began to walk eastbound on E Street N.W. and Defendant Lopez-Lucca began to follow. Defendant Lopez-Lucca then stopped following and went back to where the C-2's cell phone had fallen. Defendant Lopez-Lucca picked up the phone. C-2 said something like, "you don't have to take that." Defendant Lopez-Lucca nevertheless walked off with C-2's phone. Defendant Lopez-Lucca was last seen walking westbound on E Street N.W. C-2's phone is described as a black in color iPhone 6s with a black case. C-2 could not describe his attacker.

14.     A detective interviewed W-3. W-3 stated that she was driving in her vehicle westbound on E Street N.W. W-3 was stopped in traffic at 6th and E Streets N.W. when she observed two people fighting on the north sidewalk of the 500 block of E Street N.W. W-3 pulled her vehicle over and began honking her horn for the fight to stop. W-3 then saw one of the people involved in the fight (later learned to be C-2) disengage from the other person involved in the fight. W-3 then observed a subject (later learned to be Defendant Lopez-Lucca) pick up an object off the ground. W-3 heard C-2 state, "you don't have to take that." W-3 asked C-2 if the male suspect had taken his cell phone and C-2 stated yes. At this time, W-3 called 911. W-3 stated Defendant Lopez-Lucca walked westbound on E Street N.W. W-3 could only describe the suspect by his clothing and stated that he was wearing a black coat with the hood up and dark pants.

6

15.     The police were able to secure video footage that captures the entire offense. The video is from the north sidewalk of the 500 block of E Street N.W. The video begins at 7:28 a.m. C-2 is observed on the south sidewalk of the 600 block of E Street N.W. and it appears that Defendant Lopez-Lucca is following him. C-2 is walking eastbound and crosses over 6th Street N.W. C-2 is now on the southeast corner of 6th and E Streets N.W. and Defendant Lopez-Lucca is close behind him. C-2 then crosses the street walking north and the suspect is again following. C-2 then reaches the north sidewalk of the 500 block of E Street N.W. and is walking eastbound. Defendant Lopez-Lucca is now directly behind C-2. At 7:30 a.m., Defendant Lopez-Lucca grabs C-2 from behind and shoves him into the door opening where the assault takes place. C-2 is able to disengage and appears to be frightened by Defendant Lopez-Lucca. Defendant Lopez-Lucca then follows C-2 out of the camera view momentarily. Defendant Lopez-Lucca then reappears and picks up an object off the ground. C-2 then appears and appears to say something to Defendant Lopez-Lucca. Defendant Lopez-Lucca immediately turns around towards C-2 and throws his hands up and takes a fighting stance. C-2 backs away and the suspect walks away southbound in the block and then walks westbound on the south sidewalk of the 600 block of E Street N.W. until he is out of the camera view. Images were extracted from the footage and used to create a BOLO that was circulated through various channels.

**Attack on February 13, 2020 – 2200 block of 14th Street N.W.**

16.     Around 7:30 a.m. on February 13, 2020, the police responded to 14th and Florida Streets, N.W. for a report of an assault. The complainant for this offense (C-3) reported that she

7

was walking northbound in the 2200 block of 14th Street, N.W., carrying numerous bags on her shoulders and a back pack. C-3 was underneath a construction underpass that was poorly lit. She advised that she was attacked by a female suspect from behind and that the suspect attempted to take her book bag off of her. C-3 realized that she was being attacked from the rear and immediately let go of all the bags that she was carrying. C-3 advised that the female suspect started yelling something like "why did you steal my shit" and attempted to engage C-3 in an argument. The initial female suspect was accompanied by an additional male suspect who was carrying a bat/cane.

17.     C-3 advised that she attempted to run away from the scene while the male suspect gave brief chase. C-3 fell down to the ground and sustained injuries to her hands, knees and hip. The female suspect was last seen walking southbound in the 2200 block of 14th Street, N.W., with C-3's purse. The property taken from C-3 included her Kate Spade bag, Fossil wallet, personal credit/debit cards, registered SmarTrip card, Vaseline, and gloves. C-3 also had a "Tile" Bluetooth tracker inside her stolen purse which was unable to be live tracked due to being out of range. The last location of the tracker was pinged at 14th and U Streets, N.W. Witnesses in this case reported seeing C-3 in distress and yelling for help. The witnesses contacted the police.

18.     While a detective was interviewing C-3, she started receiving fraudulent credit card transaction alerts via text messages. The text messages alerted C-3 of fraudulent transactions occurring in Modells Store. Detectives Mufti, Taylor and Dowling responded to the nearest Modells store located at 3100 14th Street, N.W. Detectives made contact with the on-duty

employee who advised that the two individuals matching the lookout had already left the store, prior to the detectives' arrival. Detective Dowling attempted to retrieve video footage from the location while Detectives Mufti and Taylor continued canvassing for the suspects. Detectives were able to locate two additional stores where the suspects made entry which were inside DC USA Mall located at 3100 14th Street, N.W. Detectives were able to get photographs of the suspects from all three stores. Some of the stated suspect images were used to develop BOLO posters in an effort to identify the suspects.

### Further Investigation

19.     As described below, detectives were eventually able to determine that the Defendants committed the offenses on the three dates charged in the indictment. After their arrest, Defendant Dansby also put herself and Defendant Lopez-Lucca on the scene of all three incidents.

20.     On February 18, 2020, S. Reefer (C.R.S.) received a tip that stated in part, "Today, at approximately 7:00 PM, I received a call from a female ... in reference to information that she has on a robbery (CCN 20-022389) that occurred at the 700 Block of Street N.W. on February 6. She says that the female half is named Olivia..." A subpoena was submitted to PayPal in reference to a fraudulent transaction that had occurred using the federal government-issued credit card belonging to C-1 in the February 6, 2020 assault and robbery. The subpoena returned a name associated with the transaction as, 'Olivia Nicole.' The information was passed on to law enforcement partners who researched the information utilizing police databases and other resources and determined that the female suspect was Olivia Nicole Dansby. Detectives compared

9

known images of Defendant Dansby with the female suspect captured in surveillance footage and the BOLOs, and it appeared that they were the same person.

21.   In addition, Defendant Dansby and Defendant Lopez-Lucca (listed as Christian Jared Lopez) were stopped and identified together in a Prince George's County Police report (#20-0006935-001) dated February 4, 2020.

22.   On February 19, 2020, Officer Oliveto (detailed to the C.I.C.) received an anonymous tip in reference to a robbery that occurred in the 400 block of F Street N.W. and relayed in part, "the caller stated that she was watching a video from 'DMV crime report' and at the end of the video it posted a 'Persons of Interest' flyer. The only information she was able to provide was the 400 block of F St N.W. and the date of occurrence of 2/6/2020. I dated back through the CIC report and found CCN 20-022-389. She stated she recognized the male suspect… She identified the male as Christian Luca, 19 years old, Puerto Rican, and works at the I-Hop on Alabama Ave S.E. He also frequents 15th and F ST."

23.   On February 20, 2020, detectives met with an Identifying Witness who had known Defendant Lopez-Lucca for approximately 6 months and interacted with him on a regular basis. The Identifying Witness was shown images of Defendant Lopez-Lucca taken from surveillance video from the three above-mentioned investigations as well as from Instagram. The Identifying Witness identified the male individual in the images as Christian Lopez and provided his date of birth. When asked regarding the level of certainty in the identification, the Identifying Witness stated, "I'm Positive."

10

24.     As noted above, detectives researched tips that implicated other potential suspects. For example, on February 7, 2020, an anonymous caller stated that she identified the female on the MPDC picture website in reference to a Robbery Offense that happened on 02/06/2020 in the 400 block of F Street N.W. The female caller stated that the person of interest attended court today on the second floor with Judge Mitchell Rankin. The caller wanted to remain anonymous. A detective looked at the docket for Judge Rankin's courtroom as well as a listing of the names of individuals scheduled to appear. Comparisons were made based on the available information at the time, and Defendant Dansby was not matched with any of the listed individuals. On February 11, 2020, a detective received an email from an officer stating in part that a "Parking Enforcement Employee . . . stated this man [to be abbreviated C.H.] is the person of interest." The officer's email stated that the identification was in reference to CCN 20-023766. The detective compared pictures of the male suspect against pictures of the person identified and concluded that they were not the same person. On February 14, 2020, an officer mentioned to a detective that a person who had recently been arrested for robbery in the Metro system looked similar to the male suspect in this investigation. The detective ruled out that person as the suspect based on height and weight discrepancies. On February 17, 2020, a sergeant emailed a detective and stated in part, "Look at the first picture???? This may be our guy for robberies. [Name abbreviated as A.B.] from [street address redacted]." A detective researched that individual and ruled him out as a suspect based on a comparison of images and height discrepancy.

25.     After the Court issued an arrest warrant for the defendants, agents with the Federal Bureau of Investigation were conducting surveillance in a particular area of Southeast Washington, D.C., for subject Christian Lopez-Lucca on February 21, 2020. Research had revealed that Defendant Lopez-Lucca was associated with an Instagram account that had logged into Instagram from an IP address connected to a subscriber in the area. Agents arrested Defendant Lopez-Lucca after he left the apartment building, found a pocket knife in his jacket pocket, and felt an object consistent with a pipe under the other side of his jacket. Lopez-Lucca said, "It's a bat." A special agent opened Defendant Lopez-Lucca's jacket and located the item, which was the bottom portion of a walking cane with a rubber piece on the end. Approximately one hour after Defendant Lopez-Lucca's detention, Defendant Dansby was observed leaving the front entrance of the same building and was arrested as well.

26.     Device 1 and Device 2 were found in the jacket that Defendant Lopez-Lucca was wearing when he was arrested. Device 3 and Device 4 were similarly found on Defendant Dansby's person when she was arrested.

27.     Defendant Dansby stated that she was on the way to the store for her friend, providing the first and last name of W-4, who lived in the building. While Defendant Dansby was detained, W-4 approached officers and stated that Defendant Dansby was in possession of her "cards." W-4 also stated that she resided in an apartment in the building. W-4 stated that Defendant Dansby and her "short Hispanic male friend" slept in the apartment the night before. W-4 stated that Defendant Dansby had a backpack and a black coat still inside. Officers later executed a

warrant to search the apartment where the defendants had stayed. They recovered a parka (Garage brand), five gift cards, a pink wallet, three Metro SmarTrip cards, a yellow backpack containing personal hygiene products, a Target gift card, jewelry items, and an Internet hotspot.

28.     After waiving her *Miranda* rights back at the station, Defendant Dansby told detectives that she was on the scene of the February 6 assault on the 400 block of F Street N.W. Although she said she did not witness the actual assault, she explained that she did see Defendant Lopez-Lucca (whose real name she claimed not to know, but with whom she had been intimate and whom she identified from surveillance stills) walk toward someone and return shortly afterwards. Defendant Dansby admitted that she and Defendant Lopez-Lucca then began using credit cards that she knew had been stolen. In addition, Defendant Dansby admitted that she was across the street watching during the robbery on the 500 block of E Street N.W. Defendant Dansby also admitted to committing the robbery on the 2200 block of 14th Street N.W. (and said Defendant Lopez-Lucca was with her) as well as an additional robbery in Pentagon City, Virginia.

**Probable Cause that the Devices Will Contain Evidence**

29.     Based on my training and experience, I know that people who commit crime in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity. Furthermore, I know from training and experience that call logs, text messages, emails, and any app enabling communication with others

13

often include communications that shed light on the cell phone user's location and activity during a particular time period. Gathering this information from phones in the possession of the defendants would help establish their connection to the charged offenses, including their locations.

30.    Based on my training and experience, I know that people who possess weapons, unlawfully obtained money, and other contraband in Washington, D.C., often use their cell phones to capture and store images or video recordings of such contraband—sometimes called "trophy photos." They also often share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services. Similarly, they often refer to their contraband in text messages, emails, or other written communications that are carried out by and stored on their cell phone. These communications, images, and video recordings can be evidence of a perpetrator's prior possession of a weapon or contraband, and of his or her knowledge and intent relating to such possession.

31.    Based on my training and experience, I know that crimes carried out by more than one person—as charged here—often involve some amount of communication among those involved. This may involve working out details of and preparing to carry out a premeditated crime, or simply arranging to meet up someplace where an unplanned crime would later occur. Either way, I know from training and experience that cell phones are often used for this purpose and that a cell phone recovered from a participant in such criminal activity often contains evidence of communication among accomplices.

14

32.     Based on my training and experience, I know that a cell phone generally contains information which can indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, electronic communications, lists of contacts and calendar entries, social media account information, and images or video recordings—plus data associated with the foregoing, such as date and time—may indicate who used or controlled the device at particular times. From training and experience, I also know that a cell phone often contains images, video recordings, and audio recordings of the cell-phone user and his close associates. These may reveal or confirm distinguishing characteristics—such as voice, tattoos, clothing, vehicle, and hangouts—that may help identify them. In this case, moreover, identifying the owners or primary users of the Devices could reveal whether the Devices were stolen from victims rather than lawfully obtained by the defendants.

33.     Based on my training and experience, I know that witnesses and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.

34.     Based on my training and experience, I know that individuals involved in criminal activity often use their cell phones to search the internet or social media sites to learn the status of a criminal investigation, i.e. look up the newspaper articles about the crime, determine if the police have suspects, and learn the identity of witnesses.

35.     Furthermore, based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity.  For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults.  These videos have proven extremely crucial in investigations by depicting the crime itself.

### Background on Digital Devices

36.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited

16

to, desktop and laptop computers, smartphones, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling

17

communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c. A "GPS" navigation device, including certain wireless phones, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least

18

four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

        d.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

        e.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

        f.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service

19

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   g. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   h. "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

   i. A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

20

j.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

k.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

l.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

21

37.     Based on my training, experience, and research, I know that the Devices described above have capabilities that allow them to serve as wireless telephones, digital cameras, portable media player, GPS navigation device, and PDAs.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

**Computers, Electronic/Magnetic Storage, and Forensic Analysis**

38.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Devices, in whatever form they are found. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Devices for at least the following reasons.

39.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.  They also may connect the cell phones to cloud storage, which would allow law enforcement to identify cloud storage accounts associated with the phones and seek a subsequent search warrant for related accounts

(that may contain photographs, messages, and other communications pertaining to the narcotics trafficking and possession of firearms under investigation).

40.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

23

41.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Devices at issue here because:

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes

24

on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    b.  Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

    c.  A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

25

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f. I know that individuals may use a digital device as a storage medium for evidence of the crime. From my training and experience, I believe that a person who has committed the types of offenses charged in this case may store on a digital device notes or information about how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

42.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a

27

controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

   c. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

   d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword

28

terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption

29

known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

       f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

     43.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

30

a.    The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.

31

Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

44.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

45.     I submit that this affidavit supports probable cause for a warrant to search the Devices described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


Andrew McCallum
Detective, Metropolitan Police Department


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 16, 2020.


UNITED STATES MAGISTRATE JUDGE
ROBIN M. MERIWEATHER


32